# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| A.M., by and through next friend, | ) | |
| MIRAH MOORE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:15CV129 AGF |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This action is before the Court for judicial review of the Commissioner of Social Security's final decision that found minor Plaintiff was not disabled, and thus, not entitled to child's supplement security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, et seq. On February 29, 2016, upon review of the record, the Court noted that the Administrative Law Judge ("ALJ") appeared to have incorrectly referred to Plaintiff as a preschooler on the date that his application for benefits was filed and as a school-age child on the date of the ALJ's decision denying that application. Although the parties did not address this apparent error in their briefs, the Court set the case for a hearing, at which time the parties were directed to address the particular issues of (1) whether the ALJ evaluated Plaintiff's impairments under the correct age group category, and (2) if not, what impact such error has on the ALJ's decision. A hearing was held on March 16, 2016, at which Plaintiff's attorney appeared

in person and defense counsel appeared by telephone. At the hearing, both parties agreed that the ALJ erred in stating the age group categories that should apply in this case. However, the parties disagreed as to what impact, if any, the error had on the ALJ's decision. For the reasons stated below and discussed at the hearing, the Court finds that the error in this case requires reversal of the Commissioner's decision and remand of the case for further proceedings.

Plaintiff, born on August 7, 2001, filed for benefits on February 21, 2012, at age 10, through his parents. Plaintiff alleges disability since birth. After the Social Security Administration denied his claim on March 20, 2012, Plaintiff submitted a request for a hearing before an administrative law judge on May 1, 2012. The hearing was held on August 6, 2013, during which Plaintiff and his mother, Mirah Moore ("Ms. Moore"), testified. By a decision dated September 16, 2013, the ALJ upheld the denial of benefits, finding that Plaintiff was not disabled because Plaintiff's impairments did not meet, medically equal, or functionally equal the severity of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1. Plaintiff's request dated October 21, 2013 for a review of the ALJ's decision to the Appeals Council was denied on December 12, 2014. As a result, the ALJ's decision stands as the final decision of the Commissioner. *See Sims v. Apfel*, 530 U.S. 103, 107 (2000).

Having exhausted all administrative remedies, Plaintiff filed the present action for judicial review on January 15, 2015. In his brief in support of the appeal, Plaintiff argues that the ALJ failed to support his findings with substantial evidence in the record, specifically in concluding that Plaintiff had less than marked limitations in the following

two functional domains: attending and completing tasks; and caring for himself.  At the hearing before this Court, Plaintiff added that these errors were magnified by the ALJ's application of the wrong age categories.

## BACKGROUND

### Medical Records Prior to Filing (Tr. 239-52)

In an intake visit at Grace Hill Health Centers on December 1, 2011, Plaintiff presented with depression. Plaintiff said he had suicidal thoughts when he was told on August 17, 2011 that Moore was getting a divorce.  The intake record indicates that Plaintiff was experiencing social isolation, anxious and fearful thoughts, compulsive thoughts or behaviors, depressed mood, and feelings of guilt or worthlessness.  Plaintiff's mother, Ms. Moore, noted that Plaintiff made self-deprecating statements and that Plaintiff had a problem handling anger, often "kicking things, throwing things, yell[ing], ... and calling himself names."  The intake record indicates that Plaintiff performed well in school, exercised and played sports two hours per day, and watched television and used the computer one hour per day.  Plaintiff was scheduled for an initial appointment with psychiatrist Jenny Cvinar, Psy.D.  (Tr. 239-42.)

On December 22, 2011, Dr. Cvinar conducted an initial psychological evaluation of Plaintiff.  Dr. Cvinar noted that Plaintiff's problem started when Plaintiff learned of his parents' plan for a divorce.  Plaintiff had no suicidal thoughts before this point.  When he learned of the divorce, he contemplated jumping off of the roof of his apartment building.  However, gradually, Plaintiff stabilized and said he was "okay with" the divorce.  Mr. Moore reported to Dr. Cvinar that Plaintiff had a problem verbalizing emotions and was

3

irritable at times.  Plaintiffs' parents also reported that Plaintiff had a long history of

inattention and difficulties concentrating in school, as well as a history of social

difficulties and preoccupation with certain topics.  Plaintiffs' parents noted that Plaintiff

would often repeat full television episodes.  However, they also described Plaintiff as a

"straight A" student.  Plaintiff's Beck Depression Index ("BDI") results and Revised

Children's Manifest Anxiety Scale-2 ("RCMA-2") results were not clinically significant.

Dr. Cvinar diagnosed Plaintiff with adjustment disorder with depressed mood, rule-out

Asperger's Disorder, and rule-out Attention Deficit Hyperactivity Disorder ("ADHD").[1]

Dr. Cvinar noted that Plaintiff presented as a cooperative child but that he spoke in a

matter-of-fact, monotone voice, repeated words and phrases under his breath, and

endorsed difficulties in paying attention in school, where he often daydreamed about

"talking to aliens."  Dr. Cvinar also noted that Plaintiff was coping better with his

parents' divorce, and Dr. Cvinar concluded that Plaintiff did not express suicidal or

homicidal ideation.  (Tr. 244-46.)

Dr. Cvinar again met with Plaintiff and his parents on January 12, 2012 and on

February 6, 2012.  In these visits, Dr. Cvinar noted that Plaintiff's attention was

distracted.  For example, in the middle of a checkers game, Plaintiff began playing on his

own with the checkers pieces, not noticing that Dr. Cvinar was waiting for him to take his

turn.  Dr. Cvinar administered the Autism Diagnostic Observation Schedule ("ADOS") –

---

[1]      "'Rule out' in a medical record means that the disorder is suspected, but not
confirmed—i.e., there is evidence that the criteria for a diagnosis may be met, but more
information is needed in order to rule it out."  *Byes v. Astrue*, 687 F.3d 913, 916 n.3 (8th
Cir. 2012).

Module 3, for children with fluent speech. Plaintiff's results were consistent with a diagnosis of an autism spectrum disorder. Plaintiff's communication throughout the ADOS involved complex speech, but his speech varied in pitch and he would repeat certain phrases under his breath after he said them. Plaintiff was able to maintain a conversation, but his eye contact was poorly modulated and he rocked his body during a pretend play exercise. Plaintiff was observed to be very creative and to have very good attention to detail but also to be overactive, kicking his feet repetitively under the table. Plaintiff's social responsiveness was noted to be within the mild to moderate ranges, and he was noted to have somewhat of a problem with relationships with peers, following directions, and organizational skills, and a problem in completing assignments. A mental status evaluation noted that Plaintiff's appearance and affect were appropriate but that his psychomotor behaviors were fidgety and his speech was excessive. Based on the ADOS results, as well as results from parent and teacher questionnaires, Dr. Cvinar diagnosed Plaintiff with Asperger's Disorder, adjustment disorder with depressed mood, and rule-out ADHD. Dr. Cvinar noted that Plaintiff had difficulties developing peer relationships and tended to lack social reciprocity. She also noted that Plaintiff's inattention and difficulties with organization may be due to Asperger's. (Tr. 247-52.)

**Application and Function Report** (Tr. 123-134)

At the time of filing, Plaintiff's natural father, Joshua Moore ("Mr. Moore"), submitted a Function Report on his behalf; the Function Report was designed for children "age six to twelfth birthday." Mr. Moore indicated in checkbox format that Plaintiff was unable to tell jokes or riddles accurately but did not otherwise indicate any limitations in

Plaintiff's ability to communicate.  Mr. Moore also checked "yes" as to whether Plaintiff's impairment affected his behavior with other people; Mr. Moore indicated that Plaintiff does not play team sports and handwrote as further explanation that Plaintiff has problems making new friends because of his "quirkiness" and that other children make fun of Plaintiff.

Mr. Moore checked "no" as to whether Plaintiff's impairments affected his ability to help himself and to cooperate with others in taking care of his personal needs, but checked "yes" as to whether Plaintiff's ability to pay attention and stick with a task was limited.  In support of the latter limitation, Mr. Moore indicated in checkbox format that Plaintiff was able to keep busy on his own, work on arts and crafts projects, complete homework, and complete chores most of the time, but he handwrote that Plaintiff "daydreams a lot."

**School and Medical Records**

Teacher Questionnaire (Tr. 157-64)

On February 29, 2012, Plaintiff's fourth grade teacher, Stephanie Zes, responded to a questionnaire in which Ms. Zes was asked to evaluate Plaintiff in the six functional domains corresponding with the domains discussed in the Social Security Administration's regulations.  In the questionnaire, Ms. Zes filled in prompts, checked boxes, and circled numbers on a defined scale.  Ms. Zes stated that she had known Plaintiff for seven months and saw Plaintiff for six hours, five days a week during those seven months.  She rated Plaintiff's instructional level as above average for all three

criteria: reading, math, and written language.  She reported that Plaintiff was in regular education with no special instruction.

In the domains of acquiring and using information and of moving about and manipulating objects, Ms. Zes observed that Plaintiff had no problems and his functioning appeared to be age-appropriate.

In the domain of attending and completing tasks, Ms. Zes checked that Plaintiff had serious problems in three areas:  focusing long enough to finish assigned activity or task, completing class or homework assignments, and working at a reasonable pace/finishing on time.  In a handwritten note, she further commented that though Plaintiff's work, when completed, was of above average skill, he struggled with focusing to get work done or started.  Ms. Zes also checked that Plaintiff had obvious problems in refocusing to tasks when necessary and in working without distracting himself or others.  She checked that Plaintiff had slight problems in paying attention when spoken to directly, sustaining attention during play or sports activities, carrying out single-and multi-step instructions, waiting to take turns, and changing from one activity to another without being disruptive.  Ms. Zes checked that Plaintiff had no problems in organizing his own things and school materials or in completing work accurately without careless mistakes.   On an additional comments page, Ms. Zes wrote that Plaintiff's task problems "seemed to have improved recently" but that "this issue seems to vary as a problem."  She further noted that "[m]ost of the time it is really a struggle to get [Plaintiff] to finish or stay working on assignments."

In the domain of interacting and relating with others, Ms. Zes checked that Plaintiff had serious problems in two areas: expressing anger appropriately, and introducing and maintaining relevant and appropriate topics of conversation. Ms. Zes checked that Plaintiff had obvious problems in playing cooperatively with other children, making and keeping friends, using language appropriate to the situation and listener, taking turns in conversation, and using adequate vocabulary and grammar to express thoughts in everyday conversation. Ms. Zes checked that Plaintiff had slight problems in seeking attention appropriately, asking permission appropriately, following rules, telling stories, and interpreting meaning of facial expression, body language, hints, and sarcasm. Ms. Zes checked that Plaintiff had no problem in respecting and obeying adults in authority and reported that it had not been necessary to implement behavior modification strategies for Plaintiff. Ms. Zes handwrote an additional comment that Plaintiff occasionally needed to leave the room to calm down when he was upset, but that this was not very often and that Plaintiff would usually just sit with his head on his desk for a little while.

In the domain of caring for himself, Ms. Zes checked that Plaintiff had a serious problem in handling frustration appropriately. She further checked that Plaintiff had obvious problems in identifying and appropriately asserting emotional needs, responding appropriately to changes in his own mood, and using appropriate coping skills to meet daily demands of school environment. In a handwritten note, she commented that Plaintiff got mad easily when he was frustrated or felt slighted by others, and that Plaintiff would shut down and mumble things under his breath. She added that Plaintiff

"gets very hard on himself and has a hard time letting go of these emotions." Ms. Zes checked that Plaintiff had slight problems in being patient when necessary and in knowing when to ask for help, and no problems in taking care of personal hygiene, caring for his physical needs (e.g., dressing, eating), cooperating in or being responsible for taking needed medications, and using good judgment regarding personal safety and dangerous circumstances.

In the domain of health and physical well-being, Ms. Zes checked that Plaintiff did not frequently miss school due to illness and that she did not know if Plaintiff was prescribed or regularly took medication.

<u>Non-Examining Consulting Psychologist Opinion</u> (Tr. 228-233)

On March 20, 2012, non-examining psychologist, Aine Kresheck, Ph.D., of Disability Determination Services completed a Childhood Disability Evaluation Form, which asked for an evaluation in checkbox format of whether Plaintiff had extreme, marked, less than marked, or no limitation in the six domains discussed in the regulations: (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for self, and (6) health and physical well-being. Dr. Kresheck indicated that Plaintiff had a marked limitation in interacting and relating with others; less than marked limitations in attending and completing tasks and caring for himself; and no limitation in the remaining domains. In support of these conclusions, Dr. Kresheck cited portions of Ms. Zes's questionnaire, Dr. Cvinar's notes, and the Function Report completed by Mr. Moore.

9

<u>Department of Mental Health ("DMH") Services</u> (Tr. 185-95, 330-336)

A DMH social worker evaluated Plaintiff's eligibility for services on April 16, 2012. The intake form noted that Plaintiff had issues making friends and indicated that Plaintiff's socialization skills were 2.5 standard deviations below the mean.

On May 31, 2012, the DMH sent Ms. Moore a plan for Plaintiff's services. The plan included a personal profile noting that Plaintiff needed more time for assignments and exhibited some behavioral concerns, such as kicking people, slamming doors, and banging on things. The behavioral notes stated that Plaintiff had made suicidal threats, had hit his mother before, and was often bullied. The plan noted that Plaintiff could "complete all of his self-care independently with prompting," though he "prefer[ed] not to do it at all." (Tr. 191.) The plan also noted that there was some concern for Plaintiff's safety in that he did not look both ways when crossing the street, he had no fear of strangers, and he was overly concerned about other people's feelings. These tendencies posed safety risks because Plaintiff might be easily led off astray by strangers. The plan further noted that Plaintiff was not in special education and did not receive special services at school; he attended regular classes throughout the day.

<u>TouchPoint Autism Services</u> (Tr. 183-96, 205-212)

In May of 2012, after a referral from Dr. Cvinar, Plaintiff entered into a plan to receive services from a group called TouchPoint Autism Services ("TouchPoint"). The program was designed to help teens and young adults with Asperger's or high functioning autism become more social in the community.

A TouchPoint social worker conducted an assessment of Plaintiff and issued an assessment report on August 8, 2012. The assessment report included the results of a Childhood Autism Rating Scale ("CARS"), a behavior rating scale developed to identify children with autism and to distinguish them in the mild to moderate to severe range. CARS scores range from 15 to 60. Based on the social worker's observation of Plaintiff, information from Ms. Moore, and a parental report from Mr. Moore, Plaintiff scored 30, which was in the mild to moderate range of autism characteristics. The areas noted to be of greatest concern for Plaintiff included relating to people, emotional response, adaption to change, verbal communication, and level and consistency of intellectual response.

The TouchPoint assessment report also reported results from two Asperger's Disorder scales, one of which indicated a likely possibility of Asperger's Disorder and the other a low probability of Asperger's Disorder.

### Fifth Grade Report Card (Tr. 197-200)

Plaintiff's fifth grade report card, dated May 31, 2013, indicated that Plaintiff made proficient progress in completing assigned tasks; cooperating with partners and groups; and following safety, school, and classroom rules. Plaintiff made basic progress in completing homework; using effective organizational strategies; demonstrating consistent self-control; and resolving conflicts peacefully.

## Evidentiary Hearing of August 6, 2013 (Tr. 26-50)

The ALJ held a hearing on this matter on August 6, 2013. Plaintiff and Ms. Moore testified and were represented by counsel.

### Plaintiff's Testimony (Tr. 30-32)

At the time of the hearing, Plaintiff was 11 years old, but he testified that he was going to turn 12 a week after the hearing. He testified that he would be going into sixth grade the following school year. Plaintiff stated that he earned mostly As and Bs in school, and "[m]aybe a couple Cs." He testified that he completed his homework on his own and that he had five to six friends at school.

Ms. Moore's Testimony (Tr. 32-49)

Ms. Moore first corrected Plaintiff's testimony and testified that Plaintiff would be turning 12 years old the day after the hearing. Ms. Moore also stated that she did not believe Plaintiff received any Cs in school. Ms. Moore further testified that Plaintiff did not have many friends and that he did not interact much with other children at school. She testified that the friends Plaintiff referred to were other students in Plaintiff's gifted program and students who were "nice to him, kind of like more patient with him." (Tr. 33.) Ms. Moore explained that the gifted program was not a separate class but met once a week for a couple of hours in the administration building for the school district. The program conducted testing "like brain games." (Tr. 34.) Ms. Moore testified that Plaintiff did not have friends in regular classes outside the gifted program.

Ms. Moore testified that, while Plaintiff did not have trouble applying the knowledge he learned in school in real life, he might have problems putting different but interconnected tasks together. She said Plaintiff would forget to move a cooking pan away from the fire before applying flammable non-stick spray. She testified that Plaintiff could be careless without prompting, for example, by not looking both ways before crossing the street unless prompted to do so.

When the ALJ asked Ms. Moore about her concerns for Plaintiff's safety, she replied that she would not let Plaintiff go outside alone. She recounted a time when Plaintiff became upset while playing "cops and robbers." (Tr. 35.) During that game, a younger neighbor pointed his fingers in the shape of a gun at Plaintiff, at which time Plaintiff became scared, ran off, and hid in the bushes. Ms. Moore also testified that she had to chase Plaintiff around the strip mall in front of the apartment complex, an area heavy with traffic, in order to bring him back, and that Plaintiff still hid whenever he ran into the young neighbor.

The ALJ then asked Ms. Moore about Plaintiff's interactions with other children at school. Ms. Moore testified that Plaintiff got along with other children when they talked about Plaintiff's own interests and when they listened to Plaintiff, but that Plaintiff had trouble listening to and focusing on the other children's interests. Ms. Moore added that the other children would tease Plaintiff or be offended by Plaintiff's behavior.

Ms. Moore testified that Plaintiff usually got along with and listened to teachers and other authority figures unless he was upset. Ms. Moore stated that when Plaintiff got upset, he threw fits, kicked, hit, and could not be consoled, and when Plaintiff threw such fits at school, Ms. Moore would be called. Ms. Moore testified that the last time she was called for this reason was the last day of school, during a field day. Plaintiff became upset after he was reprimanded by an adult volunteer for taking too long to take his turn on a slide. In another instance, a few months before school ended, Plaintiff became upset because he left his school project at home, and he could not be consoled until his grandmother brought materials to the school to allow Plaintiff to redo the project.

13

Ms. Moore testified that Plaintiff had problems completing tasks and homework on time. When prompted to do his homework, Plaintiff would attempt to do it, but it was always difficult for Plaintiff to finish it. Ms. Moore estimated that "98 percent of the time when [Plaintiff] does an assignment, it's never done on time." (Tr. 39.) Ms. Moore noted that one of the "number one" complaints from Plaintiff's teachers was his time management.

When the ALJ asked how Plaintiff had been able to keep up good grades despite his difficulty staying on task, Ms. Moore responded that Plaintiff "almost always" had to get extensions or work through recess. (Tr. 40.) Ms. Moore explained that because the teachers did not deduct points for lateness, Plaintiff was able to keep up his grades. Ms. Moore testified that while Plaintiff could do assignments he liked, such as those in math and science, quickly, he would take a longer time to complete other assignments, such as writing. Ms. Moore stated that Plaintiff took a really long time to complete writing assignments because he felt his letters had to be perfect, and if there were any mistakes or eraser marks on the paper, he felt he had to start over.

Ms. Moore testified that Plaintiff could do basic self-care tasks, such as washing his hands after using the bathroom, but often had to be reminded to do them. For example, Ms. Moore testified that Plaintiff would stay in the running shower until Ms. Moore reminded him to soap off, wash his hair, rinse off, and get out. Ms. Moore testified that those reminders had to be given constantly throughout Plaintiff's tasks.

Plaintiff's counsel asked Ms. Moore about any accommodations she made in response to Plaintiff's behaviors. She testified that Plaintiff had a chart for his chores and

daily tasks that he would follow.  His completion of tasks earned him video games or screen time for television, instead of being grounded for not doing those tasks.  Ms. Moore testified that she used her training from TouchPoint to change the way she talks to Plaintiff, to help him listen to what she is saying.  She testified that using "when and then statements" helped Plaintiff focus on instructions, and that using hand cues helped Plaintiff control his voice level.  Ms. Moore also testified that she implemented a firm schedule for Plaintiff's daily routines, including a set time for waking up, eating breakfast, and brushing his teeth before going to school.

Ms. Moore testified that Plaintiff would act out if he could not do what he wanted, including by throwing things and, on two occasions, hitting Ms. Moore.  Ms. Moore testified that once when she tried to restrain Plaintiff from hitting her, he bit her and punched her in the head.  In another instance, he shook her and hit her with a pillow.  Ms. Moore testified that he once attempted to pick up a television to throw it, and he screamed and called his family members, including his little sister, names.  Ms. Moore testified that she was worried that as Plaintiff grew physically, she might not be able to control him.  She added that the skills and strategies she learned from TouchPoint have helped but have failed to prevent Plaintiff's disruptive behaviors.

Ms. Moore further testified that Plaintiff had depressive symptoms and would cry very loudly and for some time about things such as global warming or endangered species.  She testified that he would say things like "I want to die.  I hate my life.  I want to kill myself."  He would elaborate by saying "I want to take a machete, and I want to

saw my head off." Ms. Moore testified that it was because of statements like these that she took Plaintiff to Grace Hill.

**ALJ Decision dated September 6, 2013** (Tr. 9-21)

Although Plaintiff was 10 years old at the time he applied for benefits and turned 12 years old approximately one month before the ALJ's decision, the ALJ found that Plaintiff was a preschooler on the date application was filed and was a school-age child at the decision date.[2]

The ALJ determined that Plaintiff had not engaged in substantial gainful activity since the filing date. He found that Plaintiff had severe impairments from Asperger's syndrome, adjustment disorder with depressed mood, and rule-out ADHD, but concluded that Plaintiff's impairment or a combination of his impairments did not meet or medically equal the severity of impairments listed in the Commissioner's regulations.

The ALJ also concluded that Plaintiff did not have an impairment or a combination of impairments that functionally equaled the severity of the listings in the regulations. In reaching that conclusion, the ALJ stated that he considered all of the relevant evidence, and evaluated the "whole child," including evaluating "how the child functions in all settings and at all times, as compared to other children the same age who

---

[2]      As explained below, the regulations define the relevant age groups as:  preschool children (age 3 to attainment of age 6), school-age children (age 6 to attainment of age 12), and adolescents (age 12 to attainment of age 18).  *See, e.g.,* 20 C.F.R. § 416.926a(h).

do not have impairments." (Tr. 13.) Using that standard, the ALJ evaluated Plaintiff's limitations in six functional domains[3] as laid out in the regulations.

With respect to Plaintiff's symptoms, the ALJ found that, although Plaintiff had medically determinable impairments that could reasonably be expected to produce Plaintiff's alleged symptoms, statements about the intensity, persistence, and limiting effects of these symptoms were not entirely credible. The ALJ gave "great weight" to the opinion of non-examining consulting psychologist, Dr. Kresheck, for the stated reasons that the opinion was supported by and consistent with the evidence and that Dr. Kresheck is a mental health expert familiar with Social Security law, she reviewed Plaintiff's records, and she provided an explanation for her opinion. The ALJ also gave "great weight" to Ms. Zes's questionnaire responses for the stated reasons that the responses were supported by and consistent with the evidence and that Ms. Zes spent a significant amount of time with Plaintiff and was very familiar with his daily functioning. The ALJ did not state what weight, if any, he was giving to the medical records of Dr. Cvinar, Plaintiff's treating psychiatrist.

The ALJ found that Plaintiff had no limitation in acquiring and using information; moving about and manipulating objects; and health and well being. The ALJ found that Plaintiff had a less than marked limitation in attending and completing tasks and in caring for himself; and a marked limitation in interacting and relating with others.

---

[3]     As discussed above, the six functional domains are: acquiring and using information; attending and completing tasks; interacting and relating with others; moving about and manipulating objects; caring for yourself; and health and physical well-being. 20 C.F.R. § 416.926a(g)-(l).

In support of each of these findings, the ALJ first summarized the regulations regarding the typical functioning of a preschool child and of a school-age child in each of the domains. Then, the ALJ discussed the regulations' examples of limited functioning in each domain that did not apply to children of a particular age, but could be experienced by children in a range of ages and developmental periods. Finally, the ALJ announced his findings as to Plaintiff in each domain, and summarized the evidence in the record related to that finding.

In finding that Plaintiff had a less than marked limitation in attending and completing tasks, the ALJ noted that Plaintiff enjoyed playing video games and watched television or used a computer for one hour per day. The ALJ found significant that Ms. Zes reported Plaintiff's serious problems in three areas—struggling with focus, working at a reasonable pace, and completing assignments. But the ALJ noted that Ms. Zes reported only obvious to slight problems in other areas for this domain, and that Ms. Zes explained that Plaintiff's focus issues have improved recently, though they still varied as a problem. Moreover, the ALJ pointed to Plaintiff's fifth grade report card, which indicated that Plaintiff had made proficient progress in completing assigned task and basic progress in completing homework and using effective organizational strategies. The ALJ did not make note of Dr. Cvinar's records with respect to Plaintiff's functioning in this domain, such as his distracted attention, daydreaming about aliens, and problems completing assignments. The ALJ also did not explicitly state whether and to what extent he was comparing Plaintiff's functioning to the typical functioning of a preschool child or a school-age child, or both.

Likewise, in finding that Plaintiff had a less than marked limitation in caring for himself, the ALJ noted that, although Ms. Zes reported that Plaintiff had a serious problem handling frustration appropriately, Ms. Zes described Plaintiff's other problems in this domain as ranging from obvious to slight. The ALJ also found significant that the DMH profile of Plaintiff stated that Plaintiff "[could] complete all of his self-care independently with prompting; although, he prefers not do to it at all." (Tr. 20.) Again, the ALJ did not explicitly state whether and to what extent he was comparing Plaintiff's functioning to the typical functioning of a preschool child or a school-age child, or both.

In concluding that Plaintiff had a marked limitation in interacting and relating with others, the ALJ found that, although Ms. Zes reported that Plaintiff did not require behavior modifications, she also reported that Plaintiff had serious problems in expressing anger appropriately and introducing and maintaining relevant and appropriate topics of conversation. The ALJ noted that Ms. Zes otherwise reported obvious to slight problems in this domain and that Plaintiff's fifth grade report card showed that Plaintiff made advanced progress in respecting authority; proficient progress in listening and following directions, cooperating with partners and groups, and following safety, school, and classroom rules; and basic progress in resolving conflicts peacefully and consistently demonstrating self-control. The ALJ found significant that Mr. Moore reported Plaintiff's difficulty making new friends; and that Dr. Cvinar noted Plaintiff's difficulties in developing peer relationships and his lack of social reciprocity, poorly modulated eye contact, disruptive behavior, and preoccupation with certain interests. As with the other

domains, the ALJ did not state whether and to what extent he was comparing Plaintiff's functioning to the typical functioning of a preschool child or a school-age child, or both.

## DISCUSSION

### Standard of Review and Statutory Framework

In reviewing the denial of disability benefits, a court must affirm the Commissioner's decision if it "is supported by substantial evidence on the record as a whole." *Myers v. Colvin*, 721 F.3d 521, 524 (8th Cir. 2013) (citation omitted). "Substantial evidence is less than a preponderance, but it is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Id.* In determining whether the evidence is substantial, the Court considers evidence that both supports and detracts from the Commissioner's decision. *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007). As long as substantial evidence supports the decision, the Court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. *See Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002). A court should "disturb the ALJ's decision only if it falls outside the available zone of choice." *Papesh v. Colvin*, 786 F.3d 1126, 1131 (8th Cir. 2015) (citation omitted).

Low-income parents may obtain SSI benefits on behalf of their disabled children. 42 U.S.C. § 1382c(a)(3)(C)(i). In order to be entitled to such benefits, a child under the age of 18 must show that he or she has a medically determinable physical or mental impairment resulting in "marked and severe functional limitations," which can be

expected to result in death or which have lasted or can be expected to last for a continuous period of not less than 12 months. *Id.*

The Commissioner's regulations set out a three-step sequential evaluation process to determine whether a child's impairment or a combination of impairments results in marked and severe functional limitations. The Commissioner begins by deciding whether the child is engaged in substantial gainful activity. If so, benefits are denied. If not, at step two, the child's impairment is evaluated to determine whether it is severe. If the child's impairment is not severe, there is no disability. If the impairment is severe, at step three the ALJ compares the impairment to the childhood listings in 20 C.F.R., Part 404, Subpart P, Appendix 1 (Appendix I). If the child's impairment meets, medically equals, or functionally equals a listed impairment, the child is disabled. 20 C.F.R. § 416.924(d).

The regulations provide that "your age is an important factor when we decide whether your impairment(s) is severe . . . and whether it functionally equals the listings." 20 C.F.R. § 416.924b(a).

A child's impairment is functionally equivalent to a listed impairment if there is an "extreme" limitation in one of the six functional domains noted above, or a "marked" limitation in at least two of the domains. 20 C.F.R. § 416.926a(a); *Hudson ex. rel Jones v. Barnhart*, 345 F.3d 661, 665 (8th Cir. 2003). A marked limitation is one that "interferes seriously" with the child's ability to independently initiate, sustain, or complete domain-related activities; an extreme limitation is one that "interferes very seriously" with these abilities. 20 C.F.R. § 416.926a(e)(2), (3).

In evaluating the child's functioning in each domain, the ALJ should consider "how appropriately, effectively, and independently [the child] perform[s] [his] activities compared to the performance of other children [his] age who do not have impairments." 20 C.F.R. § 416.926a(b). In each domain, the regulations provide "age group descriptors" summarizing the typical functioning of children in each group. The age groups include preschool children (age 3 to attainment of age 6), school-age children (age 6 to attainment of age 12), and adolescents (age 12 to attainment of age 18). *See, e.g.,* 20 C.F.R. § 416.926a(h).

At oral argument before the undersigned, both parties agreed that the ALJ erred in stating that Plaintiff was a preschool child on the date of his application and a school-age child on the date of the decision. The parties agreed that Plaintiff was a school-age child on the date of his application and had reached adolescence approximately one month before the ALJ's decision. However, the Commissioner argued that this error did not impact the ALJ's decision because it was evident from the record that the ALJ used the proper age group standards to compare Plaintiff's performance to other children his age without impairments. The Court disagrees.

The Court cannot determine, from a review of the ALJ's decision, which age group category the ALJ applied to evaluate Plaintiff's functioning and, if he applied the wrong age group category, whether his analysis would have changed had he applied the correct one. Accordingly, the Court finds that remand is appropriate. *See Tisdale ex rel. B.O.H. v. Astrue*, No. 8:07-CV-862-T-TGW, 2008 WL 4145838, at *3 (M.D. Fla. Sept. 8, 2008) (finding "unpersuasive" Commissioner's argument that ALJ's error in comparing

the plaintiff's functioning to children of a younger age group was harmless because "[i]f, in making [his] determination, the law judge compared the child to the wrong age group, the determination would be fundamentally flawed."); *Butler ex rel. J.B. v. Colvin*, No. CA 12-0382-C, 2013 WL 1007717, at *3 (S.D. Ala. Mar. 13, 2013) (finding that the ALJ misidentification of the claimant as a school-age child at the time of the decision, when he had in fact reached adolescence, was "certainly error requiring remand of [the] case," and noting that "if the age descriptors meant nothing, the regulations would not make any age distinctions").

Specifically, in the domain of attending and completing tasks, the regulations state that the ALJ should consider how well the child is able to focus and maintain his or her attention, and how well the child begins, carries through, and finishes the activities, including the pace at which he performs activities and the ease with which the child changes them. 20 C.F.R. § 416.926a(h).

For a school-age child, the regulations provide:

> When you are of school age, you should be able to focus your attention in a variety of situations in order to follow directions, remember and organize your school materials, and complete classroom and homework assignments. You should be able to concentrate on details and not make careless mistakes in your work (beyond what would be expected in other children your age who do not have impairments). You should be able to change your activities or routines without distracting yourself or others, and stay on task and in place when appropriate. You should be able to sustain your attention well enough to participate in group sports, read by yourself, and complete family chores. You should also be able to complete a transition task (e.g., be ready for the school bus, change clothes after gym, change classrooms) without extra reminders and accommodation.

20 C.F.R. § 416.926a(h)(2)(iv).

For an adolescent, the regulations provide:

> In your later years of school, you should be able to pay attention to increasingly longer presentations and discussions, maintain your concentration while reading textbooks, and independently plan and complete long-range academic projects. You should also be able to organize your materials and to plan your time in order to complete school tasks and assignments. In anticipation of entering the workplace, you should be able to maintain your attention on a task for extended periods of time, and not be unduly distracted by your peers or unduly distracting to them in a school or work setting.

20 C.F.R. § 416.926a(h)(2)(v).

Given the extensive evidence of record indicating Plaintiff's significant problems with focus and task completion, the Court doubts whether substantial evidence would support a finding of a less-than-marked limitation in this area had the ALJ applied the correct age group standard. But because the Court cannot tell whether he did so, the Court will remand the case for further development of the record.

Likewise, in the domain of self-care, the regulations state that the ALJ should consider how well the child maintains a healthy emotional and physical state, including how well he gets his physical and emotional wants and needs met in appropriate ways; how well he copes with stress and changes in his environment; and whether he takes care of his own health, possessions, and living area. 20 C.F.R. § 416.926a(k).

For a school-age child, the regulations provide:

> You should be independent in most day-to-day activities (e.g., dressing yourself, bathing yourself), although you may still need to be reminded sometimes to do these routinely. You should begin to recognize that you are competent in doing some activities and that you have difficulty with others. You should be able to identify those circumstances when you feel good about yourself and when you feel bad. You should begin to develop understanding of what is right and wrong, and what is acceptable and

unacceptable behavior. You should begin to demonstrate consistent control over your behavior, and you should be able to avoid behaviors that are unsafe or otherwise not good for you. You should begin to imitate more of the behavior of adults you know.

20 C.F.R. § 416.926a(k)(2)(iv).

For an adolescent, the regulations provide:

You should feel more independent from others and should be increasingly independent in all of your day-to-day activities. You may sometimes experience confusion in the way you feel about yourself. You should begin to notice significant changes in your body's development, and this can result in anxiety or worrying about yourself and your body. Sometimes these worries can make you feel angry or frustrated. You should begin to discover appropriate ways to express your feelings, both good and bad (e.g., keeping a diary to sort out angry feelings or listening to music to calm yourself down). You should begin to think seriously about your future plans, and what you will do when you finish school.

20 C.F.R. § 416.926a(k)(2)(v).

Again, given the records from Plaintiff's parents, teacher, and medical providers indicating Plaintiff's significant problems in handling frustration appropriately and exhibiting self-control, the Court is not convinced that substantial evidence would support a finding of a less-than-marked limitation in this domain had the ALJ applied the correct age group category. But because the Court cannot tell whether he did so, the Court finds that remand is necessary. On remand, the ALJ should reconsider and weigh the evidence in accordance with the proper age group standards.

## **CONCLUSION**

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is

**REVERSED and the case is REMANDED** to the Commissioner for further

development of the record.  A separate judgment will accompany this Order.


_____
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 17th day of March, 2016.